The next case for argument this morning is 19-2616 Stennis v. Berry. Good morning, counsel. Mr. Alford, whenever you're ready, you may proceed. Thank you. Good morning. May it please the court. My name is Nick Alford, and I represent the appellant, Mr. Stennis. At its core, this appeal presents two basic questions for this court to decide. First, did the district court improperly grant summary judgment in favor of STA Meyer on Mr. Stennis' excessive restraint claim by finding that the video of the incident contradicted Mr. Stennis' version of the event? And second, did Mr. Stennis adequately plead a failure-to-protect claim against STA Berry? The factual record and the relevant case law support answering both of these questions in the affirmative. Let's start with the excessive restraint claim against STA Meyer. The only element in dispute on this claim is whether STA Meyer acted knowingly or purposefully when she applied the wrong restraints to Mr. Stennis' ankles. At this point, the district court incorrectly found that there was no genuine issue of material fact as to STA Meyer's intent and held that no reasonable juror could believe Mr. Stennis' version of the events. In reaching this conclusion, the district court erred in several respects. First, the district court incorrectly found that the video contradicted Mr. Stennis' version of the events. It did not. To the contrary, the video supports Mr. Stennis' core allegations. For example, it shows that STA Meyer was in the room with Mr. Stennis on several occasions, that she applied the wrong restraints to his ankles, that she adjusted the restraints at least one time after she applied them, and that she had at least one other physical interaction with Mr. Stennis. Moreover, the video could not contradict Mr. Stennis' allegations about what he told STA Meyer because the video was not accompanied by any audio recording. Although video evidence may at times allow district courts to find an absence of disputed material fact, the lack of any audio recording here undermines the district court's finding that the video on its own contradicted Mr. Stennis' allegations. There is no audio recording, I agree with that, but what should we make of the fact when your client, after the, I call them correction officers but I know they're not correction officers, leave the room and he appears to sort of jump up and walk like a penguin because he clearly has handcuffs on his ankles, walks over to the other guys and they're kind of laughing and he looks down at his ankles and then quickly kind of waddles back to the bench, sits down and doesn't appear to have any other conversation with anybody before he's told to get up and then kind of falls at the doorway. There's no audio, but what should we make of that? Should we just ignore it? No, I don't think we need to ignore it. I think a reasonable juror could find that he was seeking commiseration from people who might better understand how he feels having been put unjustifiably in the wrong restraints on his ankles. He sat there, no, he sat there for a long time with people passing by him and doing all sorts of other things with other people. He's not looking for anybody to listen to him. He's sitting kind of with his feet tucked under him and just waits. He doesn't stop anybody and at least the way I look at the video is, and I don't know how long that was, you know, five minutes or something, but it was a pretty long time where he sat there with all kinds of opportunity to tell someone these things on my ankles are totally out of line. And in fact, as the judge just mentioned, that, you know, he got up and shuffled around a little bit and conversed with another person and goes back and sits down and remains silent. I think we can't tell from the video alone whether he remains silent. And that's that's the question here. He alleges that he he verbally told S.T.A. Meyer that she won't apply the wrong restraints when she was doing it. And so I think there's I think it's clear that he was talking to her on the video when she was applying the restraints. So at least there, we know there's video evidence of him talking and presumably, as he alleges, telling her that they're the wrong restraints. She seems not to care, you know, and then she interacts with him one other time. And it's hard to see, you know, any any lips moving or not and whether he tells her anything. I think the district court. You could tell anyone else of all those people that were walking back and forth, different people, that these shackles or whatever you're calling them either hurt or they're the wrong ones or the chain's too short. You can't walk. You did it. That's all I'm looking at with the video. Yes, he did have some interaction when she's putting them on or tightening or loosening them. But then he sits there for a long time with all kinds of opportunity to tell someone, look at these things. Obviously, you can't even walk with him. He didn't say anything. I mean, it depends. I think we can't tell without audio whether he said anything or not. You can't tell except nobody stops or does anything. They just walk by and he continues to be stoic. I guess I'll use that word just because he's not looking at people and saying, look at my shackles and that sort of thing. He's not doing anything other than sitting and waiting as if he knows what he's going to do next. I think the district court makes the assumption that in order to inform the STAs that they apply the wrong restraints, he has to gesture or point to them. I don't think that's true at all. I think he's perfectly with it. He can tell them, as he claims you did just verbally, these are the wrong restraints. Please remove them. And if they ignore him, that's more evidence that they deliberately did it and they were ignoring his situation. Well, I thought he's made claims that he was telling other people and that they were, I don't know whether ignoring him or not. Now, maybe I'm wrong on that. I thought that that was ongoing the way he put it, that he was trying to interrupt others to look at his problem. Yeah, my understanding is that the other defendant in this case, Barry, he alleges he did tell Barry at one point that she applied the wrong restraints as well. I'm not sure he ever made attempts to tell some of the other STAs who were in the room. And so he does allege that he made attempts to tell STA Barry that the restraints were the wrong restraints as well. And there was some interaction with Barry at one point where he could have told them that in the video. And so is there any other questions on that front? No, not for me. Well, you want to just move to the failure to protect? I'm interested in that as well. OK. Yeah, we can move to the failure to protect claim. So let's see here. So as an unrepresented litigant, the district court had a duty to liberally construe Mr. Stennis' complaint and ensure his claims were given a full and fair, meaningful consideration. And under this standard, the district court, we believe, should have found that Stennis properly pled a failure to protect claim against STA Barry. To properly plead a failure to protect claim, as opposing counsel pointed out in their brief, Mr. Stennis had to plausibly allege, one, that STA Barry was aware that Mr. Stennis faced a serious risk of harm, and two, that STA Barry unreasonably decided not to do anything to prevent that harm from occurring. Mr. Stennis plausibly alleged that here. For instance, if we look at his third amended complaint, he alleged, one, that he told STA Barry that the wrong restraints had been applied and that STA Barry didn't remove them. Two, that STA Barry knew that the wrong restraints created a substantial risk that Mr. Stennis would fall and seriously injure himself. And three, that STA Barry deliberately did nothing to fix that issue when he easily could have as a member of the transportation team responsible for his safety. And so I think we see that he he he sufficiently pled a plausible failure to protect claim. Mr. Alford, you're into your rebuttal time. If you want to say anything for rebuttal, please. Thank you. Thank you, Mr. Sheffield. Good morning, Your Honors. Jonathan Sheffield representing the appellees Meyer and Barry. This court should affirm the entry of summary judgment on Stennis's excessive restraint claim, and it can do so without getting into the issue whether the video contradicts Stennis's version of events. The evidence here doesn't support a reasonable inference that Meyer applied the wrong restraint purposely or knowingly as required under Kingsley. Meyer introduced into evidence her statement that this was a mistake on her part, the result of misidentifying oversized handcuffs as leg restraints. And Stennis offered nothing to prove that this explanation was untrue. Nothing in the record shows that Meyer, at the time of cuffing Stennis, could identify these restraints as handcuffs and not leg restraints. Indeed, it was undisputed the cuffs were larger than those of typical handcuffs. And pictures confirm they're roughly the size of leg restraints. Well, except except for the fact that they had two little links in them and the other chains were about 18 inches long. That's correct, Your Honor, that the chain was shorter on this set of cuffs, but a person confronted with the stranded issue here would not know whether it was a set of handcuffs or leg restraints without training. The chain was closer to handcuffs, yes, but the cuffs resembled ankle cuffs and thus the appearance of these cuffs made it ambiguous as to their purpose. It's impossible to tell from looking at it what type of restraint this is. This ambiguity is evident in the defendant's. Mr. Sheffield, in order to find for your client, do we have to agree with you on that point? Do we have to agree that your client, that you couldn't tell the difference between the cuffs that she put on his legs and the cuffs that I guess the other guys were walking around in in that room on the video? You know, it's not like it's not like it's not like she had never seen ankle cuffs before. She could have just looked three feet away and saw the other guys walking around. Right, Your Honor. Certainly there were other detainees with different sets of restraints on their ankles. But the point is just that there's nothing in evidence to show that Meyer was able to recognize this is not a pair of leg restraints. Except for the, I mean, I guess what I'm concerned with, except for the obvious, the obvious distinction between the handcuffs that she put on his ankles and that one was like this and one was like this. Well, but I guess what do we do? Do we have to pay attention to that to find here for your client? The court only has to find or this court only has to conclude that there is insufficient evidence that Meyer knew that she was, in other words, that she was purposely, knowingly applying an excessive restraint under Kingsley. So the the appearance of these cuffs is something that's a is subject to dispute only if there is evidence that there was training to to know that this is not a set of leg restraints with small with a smaller chain. And I think that the other thing is that Your Honor pointed out he was able to amble a bit in these cuffs and did when the officers left the room. And so it's not so obvious that this is a set of restraints that a reasonable officer wouldn't have thought was possibly appropriate for preventing someone from walking with a larger gait. So. So I'm sorry, Mr. Sheffield. Is your answer to Judge Kirsch's question that we would have to agree that no reasonable officer could find a difference in these cuffs or that she wouldn't be confused that these were handcuffs as opposed to leg irons? Well, it's not that no reasonable officer could find that these were handcuffs, but simply that it could be negligence on her part in not investigating further whether these were handcuffs or leg restraints. Again, the Constitution isn't the Due Process Clause isn't implicated by negligence. It requires evidence that this officer could identify these as improper for leg restraints. And there are a multitude of ways that Mr. Sennis could have proven that with training evidence, evidence that there was only one type of leg restraint and she knew as much or that she knew how to use different types of restraints. I mean, here we have a video that shows Meyer struggled to restrain Stennis and not just with these restraints, but with each type of restraint, the waist restraint she called somebody over to help out with at one point. The video thus does not support finding at all that Meyer knew what she was doing. It shows that she generally was unfamiliar with applying each type of restraint here. And with that, it is insufficient to be a basis for finding that she knew that this restraint was not intended for ankles. The burden is on Stennis. How do you get around Mr. Stennis' testimony that he verbally told Ms. Meyer that the cuffs were wrong and they couldn't walk in them and they were hurting him? We can, the court can credit that even without the audio and the video. There is a moment where he's facing Meyer and it appears in the video that something is said. And so Meyer then responds by taking the cuffs off and then reapplying them, seeing that they fit around his ankles and then goes on about her business of restraining the rest of him before she goes on taking care of business, restraining other detainees in the holding area. So it's not as if she didn't do anything in response to that. She investigated further by seeing that that these fit on his ankles and apparently didn't cause pain or discomfort. So we'd have to conclude that that's the point when Mr. Stennis told her. I think that's the only point in the video that supports a reasonable inference that he spoke to her. And that, of course, is his declaration as well. Now, the other parts of his declaration, the video shows to be inaccurate that he asserted that he spoke to several STAs, security therapy aides rather. And but Meyer was the only officer who visibly interacted with them. They're facing each other. Their posture is conversational. And the same is true when Stennis spoke to the other detainees. You can see that he's speaking to other people on the flip side. Stennis did not speak to the other officers as they walked across the room, passed by him in and out. He never alleged that he spoke to them in passing and that they ignored him or that he talked to them and they responded. He says that they talked that he talked to them and they responded with instructions. Well, the video shows that that could not have happened. You know, let's get around to that. When I look at the video, I'm not sure the duration, but he sat there very stoically with his hands folded and and his feet kind of tucked under him and said nothing for a long period of time. I don't know whether it was five minutes or what, but he sat there a long time. We don't seem to be looking at that as all kinds of opportunities. He says he even used when, in fact, he didn't say anything to anybody. There's other people going by in and out. And yes, he did get up at some point and talk to the other prisoner and then went back and shuffled back and down. And then he just sat. And then when I look at what he how he fell. That's pretty obvious that he didn't just collapse. But anyway, you're not raising that, so maybe that's not an issue for you. Well, your honor, we just want to be careful that we're not asking this court to make a credibility determination. And you can look at the video and see that interactions didn't occur. And I think that's important. But yes, your honor, he also did stand up, walk around and come back and sit down and not visibly interact with any other officers. And there is a security concern here just because Dennis is in a holding area, an unrestrained detainee who the officers are not aware of. I mean, we don't have evidence here. The officers knew whether he was violent or not, should be restrained for the safety of officers and other detainees and to prevent the risk of flight. I do want to make sure, though, that before my time is up, that I do respond to opposing counsel's arguments about the failure to protect claim. Of course, the excessive force claim against Barry opposing counsel did not raise any arguments about and thus has forfeited that. But as far as the failure to protect claim, even if it's Mr. Sheffield, Mr. Sheffield, let me ask you a real quick question. I know it's probably going to take the rest of your time, but let me ask you a question. You're not asking us to affirm this case on a basis different than what the district court affirmed on, are you? No, Your Honor, I believe that this court can affirm on the same basis as that offered by the district court. And as far as the failure to protect claim, the district court did not expressly dismiss that at screening. That was a matter of the court allowing Stennis to proceed on different claims and Stennis not seeking permission to replete specifically a failure to protect claim. And here the evidence and here Mr. Stennis isn't asking for additional discovery on a failure to protect claim. He wants to go to trial on that. And if we consider the evidence, I see, Your Honor, that my time is expired. If you may finish with that point. Mr. Stennis doesn't seek additional discovery on the failure to protect claim, he would like to go to trial. But the evidence here is insufficient to show that Barry would have known and recognized and been able to respond to this type of restraint being on Stennis' ankles and that being improper. So with that, Your Honor, we ask that this court affirm the judgment of the district court. Thank you, Mr. Sheffield. Mr. Alfred, rebuttal, please. You're on mute. Thank you. Sorry about that. Just a few quick points. I think what the district court did here, it did make a credibility determination. I don't think the video blatantly contradicts Mr. Stennis' version of events. And so what the district court had to do was make a credibility determination in favor of S.T.A. Meyer. And I think everyone agrees here that the credibility determinations should be left for the fact finder and not the district court at the summary judgment stage. I also would like to point out that in addition to the video, Mr. Stennis had his own affidavit where he says he told S.T.A. Meyer about the issue of her applying the wrong restraints. And there's also the two pictures in our brief on page 23 of the restraints that show the large discrepancy. And so with that, I think we asked the court to reverse the district court on S.T.A. Meyer's excessive restraint claim and reverse the dismissal of the failure to protect claim against S.T.A. Berry. Thank you. Thank you, Mr. Alfred. And I believe you were appointed in this case. Is that correct? Yes. Yes. Thank you for accepting the appointment and for your contributions to the case. Thanks to both counsel. And the case will be taken under advisement. Thank you.